# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN BUSHANSKY, Derivatively on Behalf of American Renal Associates Holdings, Inc., | **CASE NO.** |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| JOSEPH A. CARLUCCI, SYED T. KAMAL, MICHAEL E. BOXER, THOMAS W. ERICKSON, JARED S. HENDRICKS, JOHN M. JURELLER, STEVEN M. SILVER, PATRICK T. RYAN, SUZANNE V. CLARK, and ROBERT H. FISH, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | |
| and | |
| AMERICAN RENAL ASSOCIATES HOLDINGS, INC., a Delaware Corporation, | |
| Nominal Defendant. | |

Plaintiff Stephen Bushansky ("Plaintiff" or "Bushansky"), by and through his undersigned counsel, respectfully submits this Verified Shareholder Derivative Complaint on behalf of Nominal Defendant American Renal Associates Holdings, Inc. ("ARA" or the "Company") against certain of its officers and directors named herein (the "Individual Defendants," as defined below, and, collectively with ARA, the "Defendants").  Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations, based upon the investigation conducted by and through his counsel.

## **INTRODUCTION**

1.      Since as early as 1994, regulators have been concerned with fraudulent and abusive practices regarding the waiver by healthcare providers of cost-sharing obligations that consumers are required to pay.  The Department of Health and Human Services ("HHS") and the Office of the Inspector General ("OIG") found that the practice of waiving patients' copay, coinsurance, and deductible obligations results in false claims, violations of anti-kickback laws, and excessive utilization of items and services paid for by Medicare.  In a Special Fraud Alert, HHS and the OIG explained that it was actively investigating healthcare service providers who routinely waive such obligations.  For over twenty years since that Special Fraud Alert was disseminated, these agencies have continued to investigate healthcare providers and promulgated rules regarding the waiver of cost-sharing obligations, as well as other related practices.

2.      ARA, a healthcare provider of outpatient dialysis services, conducted an Initial Public Offering (the "IPO") of its stock in April 2016.  In order to inflate reported revenues and profits prior to conducting the IPO, ARA convinced patients to abandon their affordable Medicare or Medicaid coverage, and enroll in commercial plans offered by affiliates of the

United Health Group, Inc. ("United") under the Patient Protection and Affordable Care Act (the "ACA"), often to referred to as "Obamacare."

3.      In order to induce patients to enroll in the more expensive commercial plans, ARA arranged for the patients' medical insurance premium to be paid by the American Kidney Fund ("AKF").  That premium assistance was funded by ARA donations to the AKF earmarked for this very purpose.  ARA would then waive the patients' copay, coinsurance, and deductible obligations, engaging in the exact conduct flagged by the HHS and OIG in their Special Fraud Alert over 20 years ago, and that they have continued to warn against.

4.      Once patients were enrolled in United's commercial plans, ARA would submit charges to United for more than 20 times the rates it had charged and would have received from Medicare or Medicaid.

5.      In various public filings and statements filed with the SEC and disseminated to investors in connection with its IPO, ARA misrepresented that it was in compliance with all federal, state and local laws, rules and regulations regarding its business.  Omitted from those public filings were disclosures concerning the steering of vulnerable patients from Medicare and Medicaid into commercial plans, using AKF to cover patient premiums, and waiving patient cost obligations to ARA for the sole purpose of collecting grossly inflated reimbursements under the ACA.

6.      On July 1, 2016, United filed suit against ARA in the United States District Court for the Southern District of Florida (the "United Lawsuit") alleging that ARA had engaged in a fraudulent scheme to obtain benefit payments from the insurance companies for dialysis services rendered to patients suffering from End-Stage Renal Disease ("ESRD"), "converting them from patients to pawns in a scheme to maximize ARA's profits."

7.     On August 18, 2016, the Centers for Medicare and Medicaid Services (the "CMS"), a federal agency within the HHS, announced that it had sent warning letters to all dialysis centers that participate in the federal Medicare program, such as ARA, and that it was weighing financial penalties on healthcare providers found to have directed patients eligible for Medicare into ACA plans, as United alleges ARA has done.

8.     The Individual Defendants, ARA's directors and top officers, have breached their fiduciary duties of care, loyalty, good faith, and candor to the Company and its shareholders. They were aware of the illegality of third party premium payments, earmarked donations to charities such as AKF, and the routine waiver of patient cost obligations, and either ignored or recklessly disregarded this illegal conduct.  By failing to adhere to the guidance provided by its regulators, the Company has suffered significant damage in its core business.  The Company faces further damage through its defense of the United Lawsuit, as well as various securities class action lawsuits brought against the Company and certain of its officers and directors.  ARA stands to suffer even greater damage upon resolution of those lawsuits, whether by settlement or after trial, unfavorably to ARA.  Moreover, the Securities and Exchange Commission (the "SEC") and the United States Attorney for the District of Massachusetts are conducting inquiries into the Company's practices, causing even further damage to ARA, its reputation and credibility.

9.     Further, in its Proxy Statement filed with the SEC on May 1, 2017 (the "2017 Proxy"), ARA made certain materially misleading representations regarding the Company's oversight and risk management practices, including, but not limited to, representing that "the leadership structure of our Board provides appropriate risk oversight of our activities."  The 2017 Proxy also omitted material information concerning the Company's lack of internal controls and

violations of healthcare laws, rules, and regulations.  These false and misleading statements and omissions were intended to induce shareholder approval of the election of several of the Individual Defendants to the Board.

10.     Plaintiff made a demand upon the ARA Board of Directors (the "Board") that it investigate the conduct alleged herein and commence legal action against those responsible for the substantial damages caused to the Company thereby.  The Board flatly refused Plaintiff's demand in a glib, evasive response letter (the "Demand Refusal") and has taken none of the demanded actions.  Since the Demand Refusal omitted any details of the investigation purportedly performed, and the facts considered, even going so far as failing to identify the members of the so-called "Demand Committee" formed to consider Plaintiff's Demand, Plaintiff, through his counsel, requested information from the Board's counsel, including a report perfunctorily referred to in the Demand Refusal.  The Board, however, through its counsel, refused to provide any further information beyond the flimsy Demand Refusal.

11.     The process employed by the ARA Board to respond to Plaintiff's Demand was not in good faith and the Board's purported investigation and conclusions are subject to reasonable doubt.  Indeed, while the Board purports to have formed a Demand Committee of three supposedly independent directors to investigate the matters set out in Plaintiff's Demand, it did not empower that committee with the ability to decide how to respond to the Demand. Instead, the committee appears only to have been allowed to provide a recommendation to the Board, and it has refused to even identify its members.  The Board's refusal to share any information regarding the purported investigation of Plaintiff's Demand and the conclusions it reached thereafter, as well as the perfunctory nature of the Demand refusal itself, all serve to collectively establish reasonable doubt as to the Board's good faith, independence, and

disinterest.  As such, Plaintiff brings this action derivatively on behalf of ARA to recover its damages, and to cause the implementation of internal controls, compliance mechanisms and corporate governance reforms designed to prevent recurrence of the misconduct that has already caused – and threatens to cause further – substantial injury to ARA.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction over the causes of action asserted under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder by the SEC, pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act. Supplemental Jurisdiction over the remaining claims exists pursuant to 28 U.S.C. § 1367.

13.     The Court has jurisdiction over each Defendant.  ARA conducts business and maintains its corporate headquarters in this District, which renders the Court's exercise of jurisdiction permissible under the traditional notions of fair play and substantial justice.  The Individual Defendants, as corporate officers or directors of ARA, have sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in this District where ARA maintains its corporate headquarters, where a substantial portion of the transactions and wrongs complained of herein occurred, and where the Individual Defendants, as corporate officers and directors of ARA, have received substantial compensation and have engaged in numerous activities that had an effect in this District.

## PARTIES

15.     Plaintiff Stephen Bushansky is a current stockholder of ARA and has continuously owned ARA common stock at all relevant times.

16.     Nominal Defendant ARA is incorporated in Delaware and maintains its principal executive offices at 500 Cummings Center, Suite 6550, Beverly, Massachusetts.  ARA is a provider of outpatient dialysis services in the United States.

17.     Non-party Centerbridge Partners, LP ("Centerbridge") is a private equity firm that purchased a majority stake in ARA in 2010.  On April 26, 2016, in connection with the IPO, ARA filed with the SEC an Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws (the "Amended Bylaws").  Pursuant to the Amended Bylaws, Centerbridge is authorized to maintain its majority voting power after the IPO and to appoint a majority of the Board.  Centerbridge, thus, maintains control over the policies and operations of ARA. Centerbridge is the Principal Stockholder of ARA, and beneficially owns shares representing the majority voting power in the Company.  As a result, ARA is a "controlled company."  Pursuant to an amended and restated stockholders agreement, as described in the 2017 Proxy, until the Company ceases to be a controlled company, Centerbridge will have the right to designate a majority of the directors on the Board.  After the Company ceases to be a controlled company, Centerbridge will maintain the right to designate nominees to the Board subject to its maintenance of certain ownership requirements in the Company.

18.     Defendant Joseph A. Carlucci ("Carlucci") is ARA's co-founder, Chief Executive Officer ("CEO"), and, since 2012, the Chairman of the Board.

19.     Defendant Syed T. Kamal ("Kamal") is ARA's co-founder and President.  Kamal has served as a director of the Company since 1999.

20.     Defendant Michael E. Boxer ("Boxer") has served as a director of ARA since 2010, and is a Senior Advisor to Centerbridge.  He is also Chairperson of the Compliance Committee.

21.     Defendant Thomas W. Erickson ("Erickson") is a director of ARA, the Chairperson of the Compensation Committee, and a member of the Nominating and Governance Committee and Compliance Committee of the Board.

22.     Defendant Jared S. Hendricks ("Hendricks") has served as a director of ARA since 2010, and is a Senior Managing Director of Centerbridge.  Hendricks is the Chairperson of the Nominating and Governance Committee, and is also a member of the Compensation Committee of the Board.

23.     Defendant John M. Jureller ("Jureller") has served as a director of ARA since 2015, and is the Chairperson of the Audit Committee of the Board.

24.     Defendant Steven M. Silver ("Silver") has served as a director of ARA since 2010, and is a Senior Managing Director of Centerbridge.  Silver is a member of the Compensation Committee and Nominating and Governance Committee of the Board.

25.     Defendant Patrick T. Ryan ("Ryan") has served as a director of ARA since May 2016, and is a member of the Audit Committee and Compliance Committee of the Board.

26.     Defendant Susanne V. Clark ("Clark") has served as a director of ARA since April 2017, and is a Senior Managing Director and General Counsel of Centerbridge.

27.     Defendant Robert H. Fish ("Fish") has served as a director of ARA since April 2017, and is a member of the Audit Committee of the Board.

28.     Defendants Carlucci, Kamal, Boxer, Erickson, Hendricks, Jureller, Silver, Ryan, Clark and Fish are collectively referred to as the "Individual Defendants."

## INDIVIDUAL DEFENDANTS' DUTIES

29.     By reason of their positions as officers and directors of ARA, and because of their ability to control the business and corporate affairs of ARA, the Individual Defendants owed and

owe ARA and its stockholders fiduciary obligations of care, loyalty, good faith, and candor.  The

Individual Defendants were and are required to use their utmost ability to control and manage

ARA in a fair, just, honest, and equitable manner and to ensure that ARA is and was complying

with prudent (and with its own) standards, including federal, state and local laws, rules and

regulations.  The Individual Defendants were also responsible for ensuring that complete and

accurate information was disseminated to government agencies, the Company's stockholders and

the investing public.

30.     The Individual Defendants, as Members of the Board and/or Senior Executives of

the Company, were and are also required, in accordance with the Company's Code of Ethics and

Conduct and Corporate Governance Guidelines, to direct and oversee the management of the

business and affairs of the Company in a lawful manner consistent with the best interests of the

Company.

31.     The Individual Defendants, because of their positions of control and authority as

directors and/or officers of ARA, were able to and did, directly and/or indirectly, exercise control

over the wrongful acts complained of herein.  Because of their advisory, executive, managerial,

and directorial positions with ARA, each of the Individual Defendants had knowledge of

material, non-public information regarding the Company.

32.     The Company maintains a Code of Ethics and Conduct (the "Ethics Code").  As

part of the Ethics Code, each of the Individual Defendants have and had the responsibility to

adhere to the following, among other, rules and guidelines:

- A Prohibition on Improper Inducements.  ARA does not attract patients by routinely waiving copays and deductibles, or by providing or promising benefits, payments, gifts or other things of value.  We have a program for financial assistance for patients in need, and our policy is to follow it in providing assistance to patients;

- Not to offer or provide anything of value to others for patient referrals or accept anything of value for referring patients to other healthcare providers; and

- ARA must comply with legal requirements applicable to a variety of healthcare arrangements, including physician joint ventures, medical director contracts, sales of interests in healthcare providers, leases, and other transactions involving payments (or the exchange of anything of value) between healthcare providers, suppliers and other referral sources.

33.     Pursuant to ARA's Corporate Governance Guidelines, the Company's officers, directors, and others with supervisory responsibility have and had additional obligations to "diligently develop and continually review practices and procedures," help ensure that the Company's practices are in compliance with the Code, and promote a culture of compliance.

**ADDITIONAL DUTIES OF THE AUDIT COMMITTEE**

34.     The members of the Audit Committee of the Board have additional duties and responsibilities.  Pursuant to the ARA Audit Committee Charter, the members of the Audit Committee were and are required, among other things, to:

- Periodically review and discuss with the Company's General Counsel any legal matters that have been brought to the Committee's attention and that could have a significant impact on the Company's financial statements; and

- Report regularly to the Board of Directors including but not limited to the Company's compliance with legal or regulatory requirements.

## ADDITIONAL DUTIES OF THE COMPLIANCE COMMITTEE

35.     The members of the Compliance Committee of the Board have additional duties and responsibilities.  The purpose of the Compliance Committee is to assist the Board in implementing and overseeing ARA and its subsidiaries' compliance with legal and regulatory requirements applicable to their operations and ARA's Compliance Program.  Pursuant to the ARA Compliance Committee Charter, the members of the Compliance Committee were and are required to, among other things:

- Review significant compliance risk areas, including healthcare regulatory compliance issues, and the steps management has taken to monitor, control and report such compliance risk exposures;

- Ensure proper communication of significant compliance issues to the full Board of Directors;

- Review and evaluate findings and recommendations from completed compliance activities and audits, including management responses and action plans; and

- At each regular meeting, meet in executive session with the Chief Compliance Officer to discuss, among other things, the Compliance Program and to receive an update on compliance activities initiated or completed during the quarter.

## SUBSTANTIVE ALLEGATIONS

36.     On April 22, 2016, ARA filed with the SEC the Prospectus in connection with its IPO.  In the Prospectus, ARA repeatedly emphasized that its performance is driven by a culture of compliance, touting its "robust compliance" with stringent billing, reimbursement, and compliance procedures.  Indeed, the Company notes its success, as compared to other dialysis centers, in avoiding penalties from regulators such as CMS.

37.     While touting its compliance efforts, ARA makes plain in its Prospectus that it is well aware of the dire repercussions of failing to maintain compliance with the laws, rules and regulations within which the Company operates.  The Prospectus expressly cautions that a failure to adhere with those various laws, rules, and regulations, including, but not limited to, Medicare

and Medicaid reimbursement requirements, could cause significant damage to the Company, and other "severe consequences."  Indeed, ARA noted that even allegations of these failures could significantly impair the Company's financial condition and business prospects.  ARA also reiterated the importance of CMS certification, and that any adverse findings could have an adverse effect on the Company's operating results and financial condition.

38.     Regarding state False Claims laws, ARA, in the Prospectus, touts its compliance, and again acknowledges that violations of these laws could materially impact the Company's operations.  The Prospectus expressly cautions that "[i]f we fail to adhere to all of the complex federal, state and local government regulations that apply to our business, we could suffer severe consequences," and that "[d]amage to our reputation or our brand in existing or new markets could negatively impact our business, financial condition and results of operations."

39.     Despite ARA's numerous representations in the Prospectus that it was in full compliance with all relevant laws, rules and regulations, the truth was far to the contrary.

40.     On July 1, 2016, United filed a lawsuit against ARA in the United States District Court for the Southern District of Florida, *United Healthcare of Florida, Inc., et al v. American Renal Associates Holdings, Inc., et al.,* No. 9:16-cv-81180-KAM.  The United Lawsuit lays bare ARA's failure to comply with federal, state and local laws, rules and regulations, and the falsity of the Company's assurances to the contrary.  The Complaint alleges a fraudulent and illegal scheme by ARA to maximize profits by targeting patients suffering from ESRD.  While United only sued on behalf of Ohio and Florida patients, it made clear in its complaint that ARA's scheme was not limited to those states.  Indeed, the complaint specifically notes that the California Department of Managed Health Care had notified United of "certain out-of-network

requests that had been submitted to UnitedHealthcare Benefits Plan of California for outpatient dialysis."

41.     On July 5, 2016, ARA filed with the SEC a Current Report on Form 8-K regarding the United Lawsuit, which stated as follows.

> On July 1, 2016, American Renal Associates Holdings, Inc. (the "Company") received a complaint filed by three affiliates of UnitedHealth Group Inc. ("United") in the United States District Court of the Southern District of Florida. The complaint relates to 27 patients who have received dialysis at 12 ARA facilities in Florida and Ohio and who elected to receive coverage under one of United's Affordable Care Act ("ACA") insurance products, effective on or after January 1, 2016.  At this time, approximately 33 patients across 15 clinics in 5 states with United ACA products receive dialysis care at the Company's facilities. The complaint identifies approximately $1.9 million of payments made to 12 of the Company's facilities that United claims were improper.  The complaint seeks monetary damages and injunctive relief.  The Company believes this lawsuit is without merit.  The Company intends to vigorously defend itself in this legal matter; however, no assurance can be given as to the timing or outcome of this matter, or can any assurance be given as to whether the filing of this lawsuit will affect the Company's other relationships, or the Company's business generally. The Company's top priority continues to be providing the highest quality care to patients that choose to receive dialysis services at the Company's facilities.

42.     According to the United Lawsuit, ARA systematically targeted Medicare and Medicaid eligible patients, and through deceptive and unlawful practices convinced them to enroll in United plans and reject the more affordable government plans.  Thus, ARA was able to bill United more than $4,000 for services rendered to Medicare and Medicaid eligible patients at twenty times less the price.

43.     In order to induce ESRD patients to use United plans instead of Medicare or Medicaid, ARA secured premium assistance from the AKF to cover the patients' commercial plan premiums.  AKF has a Health Insurance Premium Payment ("HIPP") program to assist individuals who cannot afford the cost of their premiums by providing charitable assistance. AKF describes the HIPP program as a "last resort" source of assistance to dialysis patients, and

is restricted to those patients who have no means of paying health insurance premiums and who would forego coverage otherwise.  ARA made earmarked donations to the AKF, a 501(c)(3) organization, for this purpose.  ARA would then counsel patients and assist them with enrollment into the commercial plans most favorable to ARA, resulting in the highest out of network reimbursement for ARA.  Then, in violation of the language of United's applicable commercial plans, ARA waived the patients' copay, coinsurance and deductible obligations.

44.     ARA controlled every step of the patient relationship with the AKF – introducing the AKF's HIPP programs to patients in ARA clinics, providing applications to patients, assisting patients in filling out the applications, and then submitting the applications on behalf of the patients.  Many patients would then bring bills for the premiums to ARA clinics, and ARA would ensure the premiums were paid.  Other patients were instructed that the AKF would send them premium assistance checks directly, as a means of avoiding detection by insurance providers that did not accept third-party premium payments.

45.     As a result of this scheme, patients who already had access to Medicare and Medicaid coverage were enrolled in United plans they did not need and could not afford, and ARA increased its per-dialysis-session reimbursement rate to more than 20 times the sub-$200 payments it would have received had it billed Medicare or Medicaid.

46.     United has stopped all payments to ARA pursuant to this scheme, and in response ARA has started causing unwarranted clinical "gap exception" requests to be submitted to United in order to continue to get paid at the fraudulently inflated rate described herein.

47.     The Individual Defendants knew or recklessly disregarded that the waiver of cost-sharing obligations has long been identified as a fraudulent and abusive practice within the healthcare industry.

48.     As far back as 1994, the HHS and OIG had issued a "special fraud alert" directly to healthcare providers explaining that waiving cost-sharing obligations was problematic.  The OIG stated such activity was "misstating its actual charge" and that by engaging in such activity, providers could be unlawfully inducing patients to purchase their services.  This activity is also specifically prohibited and identified as insurance fraud under Fla. Stat. § 817.234(7)(a).

49.     In 1997, the AKF asked the OIG for an advisory opinion as to whether it could implement a program wherein it would take donations from renal dialysis providers and use the donations to pay for premiums for financially needy patients with ESRD without violating the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), which, pursuant to Section 231(h), gives the OIG the authority to impose civil monetary penalties against entities that offer remuneration to a program beneficiary that they know or should know will influence the beneficiary's decision to order or receive items or services covered by Medicare or Medicaid from a particular provider, practitioner, or partner.

50.     On June 11, 1997, in response to the AKF's request, the OIG issued Advisory Opinion 97-1, which set forth guidelines for the AKF and healthcare providers to follow in order to avoid violating HIPAA.  Specifically, the OIG stated that AKF could not "earmark" "contributions . . . for the use of particular beneficiaries or groups of beneficiaries," "take into account the identity of the referring provider or the amount of any donation to AKF by such provider," or "assure" providers "that the amount of HIPP assistance their patients receive bears any relationship to the amount of their donations."

51.     The OIG also stated that providers could "not track the amounts that AKF pays on behalf of patients dialyzing at their facilities in order to calculate amounts of future contributions[.]"  Finally, the OIG emphasized that HIPP assistance should be "available to any

financially needy ESRD patient regardless of provider" and should not be "limited to patients of the [donating] companies."

52.     In a November 2005 Supplemental Special Advisory Bulletin, the OIG again provided guidance on the application of fraud and abuse laws to Patient Assistance Programs ("PAP").  Specifically, the OIG noted that some charities focus their efforts on patients with particular diseases, and that donors may earmark funds for patients with those specific diseases. Donations in these scenarios, the OIG explained, presented an "elevated risk" of fraud and abuse. As a result, it was recommended that companies limit earmarked donations to PAPs.

53.     In a November 4, 2013 FAQ, the HHS Secretary recommended that insurance issuers reject third party premium payments.  Specifically, the HHS Secretary stated:

> The Department of Health and Human Services (HHS) has broad authority to regulate the Federal and State Marketplaces (*e.g.*, section 1321(a) of the Affordable Care Act).  It has been suggested that hospitals, other healthcare providers, and other commercial entities may be considering supporting premium payments and cost-sharing obligations with respect to qualified health plans purchased by patients in the Marketplaces.  HHS has significant concerns with this practice because it could skew the insurance risk pool and create an unlevel field in the Marketplaces.  HHS discourages this practice and encourages issuers to reject such third party payments.  HHS intends to monitor this practice and to take appropriate action, if necessary.

54.     In a May 30, 2014 Supplemental Special Advisory Bulletin, the OIG again weighed in on the issues relating to PAPs and charities, stating that donor contributions may implicate the federal Anti-Kickback Statute if made to induce a PAP to recommend donor products or otherwise influence patients. The OIG explained further:

> Two remunerative aspects of PAP arrangements require scrutiny under the anti-kickback statute: donor contributions to PAPs (which can also be analyzed as indirect remuneration to patients) and PAPs' grants to patients.  If a donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally reimbursable items, the statute could be violated.  Similarly, if a PAP's grant of financial assistance to a patient is made to influence the patient to purchase (or to induce the patient's physician to prescribe) certain items, the statute also could be violated.  A determination regarding whether a particular

arrangement violates the anti-kickback statute requires an individualized evaluation of all of the relevant facts and circumstances, including the parties' intent. For PAPs, the nature, structure, sponsorship, and funding of the particular PAP are factors relevant to the analysis.

55.     In the May 2014 bulletin, the OIG also expressed concerns regarding charities recommending the products of donors, suggesting the fund is operated to induce the purchase of the donor's products. Specifically, the OIG emphasized that:

> A charity with narrowly defined disease funds may be subject to scrutiny if the disease funds result in funding exclusively or primarily the products of donors or if other facts and circumstances suggest that the disease fund is operated to induce the purchase of donors' products.

56.     The OIG elaborated in the bulletin that donors to these types of charities should not be provided with information sufficient to match their donations with the number of recipients using their products, stating that efforts by donors to do that "may be indicative of a donor's intent to channel its financial support to copayments of its own products, which would implicate the anti-kickback statute."

57.     The Individual Defendants were also aware that the United plans that ARA was recommending to patients followed these guidelines, and did not accept third party payments, requiring patients to make their own premium payments. Likewise, the Individual Defendants knew, or recklessly disregarded, that the patients targeted for the United plans could not afford the additional payments charged by those plans. To eliminate these costs, ARA violated various state and federal laws, defrauding United in the process.

58.     AKF and its operations have also come under increased scrutiny. Blue Cross of Idaho recently began to refuse to accept premium payments from third parties such as AKF. AKF challenged this attempt. In response, Dean L. Cameron, the Director of Idaho's Department of Insurance, in a March 17, 2016 letter, supported Blue Cross of Idaho's decision as furthering the interests of its customers, as well as the general public. The Director of the Idaho

Department of Insurance's letter made several important observations about AKF.   Citing to

AKF's own annual report, Director Cameron noted that AKF's HIPP program is funded by

contributions from dialysis providers who "have a financial interest in their patients' care," and

concluded that those providers are "indirectly paying the premiums" for the patients who secured

assistance from AKF.

59.     On July 26, 2016, the SEC informed the Company of an inquiry into its conduct

regarding patients who have received, and some of whom continue to receive, dialysis at clinics

in Florida and Ohio and who received coverage under one of United's ACA insurance products.

60.     On August 18, 2016, CMS issued a Request for Information (the "RFI") seeking

public comment regarding "health care providers and provider-affiliated organizations steering

people eligible for or receiving Medicare and/or Medicaid benefits to an individual market plan

for the purpose of obtaining higher payment rates."

61.     Also on August 18, 2016, CMS issued a press release reiterating its concerns

expressed in the RFI and announcing that it had launched an investigation into dialysis centers,

such as ARA, engaging in the inappropriate steering of people eligible for Medicare or Medicaid

into commercial plans, and third party premium provider and affiliated organization payments,

and that it was weighing financial penalties on providers found to have fraudulently and

deceptively directed people eligible for Medicare and Medicaid into commercial plans instead.

The press release noted that CMS "also sent letters to all Medicare-enrolled dialysis facilities,"

such as ARA, "informing them of this announcement."

62.     The CMS August 18, 2016 press release stated with regard to correcting the issues

it identified:

> CMS is also considering potential regulatory and operational options to prohibit
> or limit premium payments and routine waiver of cost-sharing for qualified health

plans by health care providers, revisions to Medicare and Medicaid provider enrollment rules, the imposition of civil monetary penalties for individuals that fail to provide correct information about consumers enrolling in a plan, and potential changes that would allow issuers to limit their payment to health care providers to Medicare-based amounts for particular services and items of care. In particular, CMS is looking at authorities to impose civil monetary penalties on health care providers when their actions result in late enrollment penalties for Medicare eligible individuals who are steered to an individual market plan and, as a result, are delayed in enrolling in Medicare.

63. On September 2, 2016, a class action lawsuit was filed against ARA, Carlucci, and Kamal, as well as Jonathan Wilcox ("Wilcox"), the Company's Chief Financial Officer, regarding the events described herein. *See Esposito v. American Renal Associates Holdings, Inc.*, 1:16-cv-11797 (D. Mass.). The lawsuit alleges violations of the Securities Act of 1933 and Securities Exchange Act of 1934. The Company will be forced to expend significant amounts to defend itself in the lawsuit and may face additional material liability after trial or through settlement.

64. On November 11, 2016, Wilcox revealed in a conference call with analysts that, as of September 30, 2016, "approximately 535 patients elected coverage under ACA plans" and that "approximately 300 patients that have chosen ACA plans also had Medicaid as secondary coverage and virtually all of these patients received assistance from the AKF." It was also revealed that "[o]f the remaining approximately 235 patients enrolled in ACA plans, approximately 85% of them received assistance from the AKF HIPP program." These numbers are in stark contrast to the "27 patients" ARA had initially disclosed in connection with the United lawsuit.

65. As a result of the RFI, on December 14, 2016 CMS issued an Interim Final Rule ("IFR") on Conditions for Coverage of End-Stage Renal Disease Facilities-Third Party Payment based on over 800 public comments it received from various sources including patients,

providers, and provider-affiliated organizations involved in the financing of care for patients, health insurance companies, and social workers.  CMS noted in the IFR that the Government had serious concerns about the "steering" of patients by dialysis providers.  CMS also noted that dialysis providers such as ARA were motivated to steer patients onto private insurance under the ACA because such plans reimbursed the providers at a far greater rate than Medicare or Medicaid for the same treatments.

66.     On January 9, 2017, ARA filed with the SEC a Current Report on Form 8-K announcing that it had received a subpoena on January 3, 2017 from the Department of Justice "requesting information relating to the Company's interactions with the American Kidney Fund ('AKF') and certain topics related to applicable healthcare laws for the period from January 1, 2013 through the present."  The Company stated that it intended to fully cooperate with the request.

67.     On March 8, 2017, ARA filed with the SEC its Annual Report on Form 10-K for the Fiscal Year ended December 31, 2016 (the "2016 10-K").  In the 2016 10-K, ARA disclosed that its "estimated annual financial impact associated with a more restrictive environment for patients previously enrolled in ACA plans who also relied on charitable premium assistance is expected to be $25 million in 2017 (an increase to our previously reported estimate of $24 million)."

68.     ARA also revealed in the 2016 10-K that it had received letters from several insurance companies, "indicating that they will not insure patients who receive premium payment assistance from third-party charitable organizations."

69.     On May 1, 2017, the Individual Defendants caused ARA to file with the SEC the

2017 Proxy, which made certain representations, specifically with regard to risk management,

stating as follows:

> Our Chief Executive Officer, President, Chief Financial Officer and other
> executive officers regularly report to the non-executive directors and the Audit,
> Compensation, Nominating and Corporate Governance, and Compliance
> Committees to ensure effective and efficient oversight of our activities and to
> assist in proper risk management and the ongoing evaluation of management
> controls.  We believe that the leadership structure of our Board provides
> appropriate risk oversight of our activities.  The Board has extensive involvement
> in the oversight of compliance and risk management related to us and our
> business and accomplishes this oversight through the regular reporting by the
> Audit Committee and the Compliance Committee.  The Audit Committee
> represents the Board by periodically reviewing our accounting, reporting and
> financial practices, including the integrity of our financial statements, the
> surveillance of administrative and financial controls, our compliance with legal
> and public company regulatory requirements and our enterprise risk management
> program.  Through its regular meetings with management, including the finance,
> legal, compliance and internal audit functions, the Audit Committee reviews and
> discusses all significant areas of our business and summarizes for the Board all
> areas of risk and the appropriate mitigating factors.  In addition, our Board
> receives periodic detailed operating performance reviews from management.
> Further to such oversight, the Compliance Committee represents the Board by
> reviewing our healthcare-related regulatory and compliance programs and
> policies, including the review and approval of any compliance program initiatives,
> annual audit plans and trainings, as well as monitoring, controlling and mitigating
> healthcare compliance risk exposure.  The Compliance Committee meets
> periodically with our executive compliance committee and the chief compliance
> officer to assess the effectiveness of our compliance programs and recommends
> any necessary modifications to the Board and management.

70.     With regard to the director nomination process, the 2017 Proxy represents:

> Our Board seeks to ensure that it is composed of members whose particular
> experience, qualifications, attributes and skills, when taken together, will allow
> the Board to satisfy its oversight responsibilities effectively.  The Nominating and
> Corporate Governance Committee weighs the characteristics, experience,
> independence and skills of potential candidates for election to the Board and
> recommends nominees for director to the Board for election.  In considering
> candidates for the Board, the Nominating and Corporate Governance Committee
> also assesses the size, composition and combined expertise of the Board.  As the
> application of these factors involves the exercise of judgment, the Nominating and
> Corporate Governance Committee does not have a standard set of fixed

qualifications that is applicable to all director candidates, although the Nominating and Corporate Governance Committee does at a minimum assess each candidate's strength of character, mature judgment, familiarity with the Company's business and industry, independence of thought and an ability to work collegially with the other members of the Board.  In addition, although the Board considers diversity of viewpoints, background and experiences, the Board does not have a formal diversity policy.  In identifying prospective director candidates, the Nominating and Corporate Governance Committee may seek referrals from other members of the Board, management, stockholders and other sources, including third party recommendations.  The Nominating and Corporate Governance Committee also may, but need not, retain a search firm in order to assist it in identifying candidates to serve as directors of the Company.

***

In addition to the process described above, the Nominating and Corporate Governance Committee also nominates a number of individuals designated by Centerbridge Capital Partners, L.P. and certain of its affiliates ("Centerbridge") as required under the provisions of the stockholders' agreement described below under "Transactions With Related Persons-Stockholders Agreement."  The stockholders agreement provides that until we cease to be a controlled company, Centerbridge will have the right to designate a majority of our directors. After we cease to be a controlled company, Centerbridge will continue to have the right to designate nominees to our board of directors, subject to the maintenance of certain ownership requirements in our company.  Centerbridge has designated Messrs. Silver, Hendricks, Boxer, Erickson, Jureller and Fish, as well as Ms. Clark, as directors.  Messrs. Carlucci and Kamal became our directors pursuant to the rights granted to them under the stockholders' agreement.

When considering whether the nominees have the experience, qualifications, attributes and skills, taken as a whole, to enable the Board to satisfy its oversight responsibilities effectively in light of our business and structure, the Board focused primarily on the nominees' contributions to our and our subsidiaries' success in recent years and on information discussed in each of the nominee's biographical information set forth above.  We believe that our director nominees provide an appropriate mix of experience and skills relevant to the size and nature of our business.

71.    The representations made in the 2017 Proxy were materially misleading in that they represented to investors that ARA's Board was providing adequate risk oversight over the Company's activities, and that the Board was composed of members who would ensure effective

oversight.  These representations were materially false and misleading and omitted material information regarding the misconduct specified herein.

72.     As a result of the materially misleading statements in the 2017 Proxy, as well as the material omissions regarding the lack of an effective internal control structure, compliance mechanisms, and the numerous legal violations described herein, ARA shareholders voted to approve the election of Defendants Boxer, Erickson, and Fish to the Board.

73.     On May 8, 2017, the United States District Court for the Southern District of Florida granted, in part, and denied, in part, a motion to dismiss filed by ARA in the United Lawsuit.  The Court terminated ARA as a defendant, without prejudice, leaving its operating subsidiaries, American Renal Associates, LLC, and American Renal Management LLC, as the remaining defendants.

74.     On May 9, 2017, ARA filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2017 ("1Q17 10-Q").  The Company disclosed in the 1Q17 10-Q that it "has received letters from other insurance companies seeking information regarding matters relating to the insurance companies' covered patients similar in nature to the matters underlying the United complaint."

## DERIVATIVE ALLEGATIONS

75.     Plaintiff brings this action derivatively in the right and for the benefit of ARA to redress injuries suffered, and to be suffered, by ARA and its stockholders as a direct result of the breaches of fiduciary duty by the Individual Defendants.  ARA is named as a nominal defendant solely in a derivative capacity.

76.     This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

77.     Prior to bringing this action, Plaintiff made a demand on the ARA Board pursuant to 8 Del. C. § 327 requesting that the Board investigate, take suitable action to remedy the ARA directors' and officers' breaches of fiduciary duty and obtain compensation from responsible parties for damages suffered by ARA as a result of the fiduciary duty breaches described herein. Plaintiff's demand was made by letter dated January 27, 2017 from his counsel to the Board (the "Demand").  A copy of the Demand is attached hereto as Exhibit A.

78.     On May 8, 2017, ARA, through its counsel, conveyed a letter to Plaintiff's counsel rejecting Plaintiff's Demand (the "Demand Refusal") (attached hereto as Exhibit B), stating:

> This letter responds to your letter dated January 27, 2017, on behalf of Stephen Bushansky (the "Demand"), in which you, on behalf of Mr. Bushansky, demand that the Board of Directors ("Board") of American Renal Associates Holdings, Inc. ("ARAH" or the "Company") (1) investigate the allegations of wrongdoing set forth in the Demand; (2) institute claims on behalf of the Company "the "Claims") against unspecified persons; and (3) implement unspecified internal controls, compliance mechanisms and corporate governance measures.

> In response to the Demand, the Board of Directors of ARAH (the "Board") formed a committee (the "Demand Committee"), among other things, to assist the Board in connection with responding to the Demand or any related proceedings, and to review the facts and circumstances relating to the allegations contained in the Demand.  The Demand Committee is comprised of three of the six outside, non-management directors currently serving on the Board.  The Demand Committee engaged Milbank, Tweed, Hadley & McCloy LLP ("Milbank") to assist the Demand Committee in connection with fulfilling its duties.

> The Demand Committee conducted a good faith investigation.  The Demand Committee received a report from Milbank on an internal review already conducted by Milbank, the civil litigation and government inquiries facing the Company, and the applicable legal principles.  The Demand Committee also considered the information its members had learned in prior meetings in connection with the internal review previously conducted by Milbank.  During the course of the investigation, Milbank answered questions from members of the Committee, and thoroughly discussed the issues relevant to the Demand.

> After a thorough consideration of the Demand, the Demand Committee made a recommendation to the Board that the Demand be refused.  The Board, after being

fully informed as to all relevant facts and legal principles, and considering the recommendation of the Demand Committee, determined, in the exercise of its business judgment, that it is not in the best interests of ARAH to pursue any of the actions set forth in the Demand at this time.

*Conclusion*

Exercising its independent business judgment, the Board has unanimously voted that the Demand be refused.  The Board directed that Milbank send this response to you.

79.     The Demand Refusal is wrongful in that it is not the product of an independent, good faith, and reasonable investigation of the matters set forth in the Demand Letter, and is not the product of a reasonably informed decision.

80.     On May 23, 2017, Plaintiff's counsel wrote to ARA's counsel, requesting production of any report or other record of the purported investigation performed by the Board or its counsel, and additional documents related to its purported investigation and determination. *See* Exhibit C hereto.

81.     On June 6, 2017, ARA's counsel rejected Plaintiff's request for information reflecting the basis for the Demand Refusal, stating that "[t]he Company declines to provide you the documents requested in your letter" and failed to provide any reason for this determination. *See* Exhibit D hereto.

82.     Accordingly, Plaintiff has no adequate remedy at law and is forced to bring this equitable action in the name and right of the Company to protect its interests and those of its stockholders.

83.     The Board's determination to refuse Plaintiff's Demand, and subsequent refusal to provide the report, or any documents it relied upon in making the determination to refuse Plaintiff's Demand, and the failure to provide any factual basis upon which the Demand was

refused, evidence that the Board's determination was not made in good faith and with the required independence and disinterestedness.

84.    The Demand Refusal failed to provide a proper foundation for refusing the Demand for at least the following reasons:

(a) The decision to refuse the Demand was made by the Board, rather than the so-called "Demand Committee."  However, the Demand Refusal makes no representation as to performing any investigation whatsoever as to the disinterest and independence of the Board.  In fact, the Demand Refusal does not disclose the members of the Demand Committee, or any investigation as to those directors' disinterest or independence either.  As is shown below, the members of the ARA Board are not independent or disinterested and did not act with the disinterest and independence required to fairly consider Plaintiff's Demand;

(b) The Demand Refusal claims that the Board was advised by the law firm of Milbank, Tweed, Hadley & McCloy LLP ("Milbank") in making its determination to reject Plaintiff's Demand.  However, the Demand Refusal makes no representation as to performing any investigation whatsoever as to the independence of Milbank, including, but not limited to, whether Milbank has represented ARA, its Board, any Board member(s), or any entity in which any of the Board members are control persons.  In fact, Milbank is not independent of ARA and its Board.  Rather, Milbank represents ARA in the securities fraud class action lawsuit.  Milbank has also represented Centerbridge Partners in various corporate transactions;

(c) No details are provided of the purported investigation made by the Demand Committee or the Board.  In fact, the Demand Committee, the Board, and their

counsel, have flatly refused to provide any of the details regarding their purported

investigation.  As such, no basis for the Board's Demand Refusal has been

established and there is reasonable doubt as to the investigation and the independence

of those that purportedly performed the investigation;

(d) The Demand Refusal does not indicate whether the purported investigation of

Plaintiff's Demand uncovered wrongful or culpable conduct by any directors, officers

or employees of ARA.  As such, the Demand Refusal was not based upon a good

faith investigation, as required;

(e) The Demand Refusal states that the Board determined that pursuing claims against

those responsible would not be in the best interests of ARA, but does not provide any

facts upon which that determination was made.  As such, the Demand Refusal and the

good faith of those who made that Demand Refusal are subject to reasonable doubt;

(f) The Demand Committee failed to quantify the amount of time and resources

necessary to bring the claims that are subject of the Demand;

(g) The Demand Refusal does not identify or refer to any interview of witnesses, and

certainly makes no representation that it discussed with United, the SEC, the U.S.

Attorney for the District of Massachusetts, or any investigator the conduct at issue

herein; and

(h) The Demand Committee's failure to make Milbank's purported  report public

standing alone demonstrates that the underlying investigation was not the product of

good faith and due care and did not reach a reasonable result.

85.     The Board's determination to take none of the demanded actions was not made in good faith or by independent and disinterested directors.  In fact, it is clear that ARA's directors could not act with the required independence and disinterestedness in considering a demand:

(a)   Defendants Jureller, Fish and Ryan were members of the Audit Committee of the Board.  Pursuant to the Audit Committee Charter, these Defendants were required to oversee legal matters that could have a significant impact on the Company's financial statements and to oversee the Company's compliance with legal or regulatory requirements, but in violation of their fiduciary duties failed to perform that required role.  The Company, because of these failures, was in violation of various state and federal laws, rules and regulations, which have directly resulted in the liabilities described herein;

(b)   Defendants Boxer, Erickson, and Ryan were members of the Compliance Committee of the Board when the events described herein occurred.  Pursuant to the Compliance Committee Charter, these Defendants were required to ensure ARA's compliance with all legal and regulatory related aspects of the Company's business, and to remain updated on all relevant developments.  In violation of their fiduciary duties, these Defendants failed to perform that required role.  The Company, because of these failures, was in violation of various state and federal laws, rules and regulations, which have directly resulted in the liabilities described herein;

(c)   Defendants Carlucci, and Kamal are not disinterested with regard to the matters at issue in this lawsuit since they are members of the Company's management team and have each been named as defendants in securities class action litigation for their role in the publication of false and misleading financial information and face a

27

substantial likelihood of liability therefor.  These Defendants cannot fairly consider the claims at issue here since their personal financial interests are at stake;

(d)   The Individual Defendants, as officers and directors of ARA, pursuant to the Company's Code of Ethics and Conduct, were required to ensure the Company was in compliance with all laws and regulations relevant to the business, including ensuring that the Company was not routinely waiving patient cost obligations. Furthermore, the Code of Ethics and Conduct required the Individual Defendants to accurately report material, non-public information.  In violation of their fiduciary duties, these Defendants failed to perform that required role.  The Company, because of these failures, was in violation of various state and federal laws, rules and regulations, and has been named as a defendant in a securities fraud class action lawsuit;

(e)   There is a substantial likelihood that the Individual Defendants, who are current members of the Board, will be found liable for violating federal securities laws and for breaches of fiduciary duty since they signed the false and misleading Registration Statement and Prospectus, filed with the SEC in April 2016;

(f)   ARA has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Board members have not attempted to recover for ARA the damages it has suffered or will suffer thereby;

(g)   The Individual Defendants were aware of, but failed to investigate, numerous red flags of illegal or improper conduct and, had they done so, could have taken – and were required to take – timely action to prevent, or at least minimize, the damages caused.  In fact, the Individual Defendants were repeatedly put on notice of

regulators' concerns as to ARA's practices, but they failed to implement a system of controls designed to monitor or mitigate those very risks;

(h)   The Individual Defendants herein received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of ARA.  They have thus benefited from the wrongs herein alleged and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Individual Defendants also have close personal or business ties with each other.  Indeed, Defendants Boxer, Hendricks, Silver, and Clark are all employed by Centerbridge, the Company's controlling shareholder.  The Individual Defendants are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves;

(i)   In order to bring this action for breach of fiduciary and common law duties, the members of the ARA Board would have been required to sue themselves and their fellow directors and officers, which they would not do; and

(j)   Publicly traded companies, such as ARA, typically carry director and officer liability insurance from which ARA could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that would foreclose a recovery therefrom in the event ARA sues to recover its damages from the Individual Defendants.

## COUNT I

### VIOLATIONS OF SECTION 14(A) OF THE EXCHANGE ACT

86.     Plaintiff incorporates by reference and realleges each and every above allegation as though fully set forth herein, except for allegations of reckless or knowing conduct by the defendants, which are not referred to or incorporated for the purpose of this claim.

87.     The Section 14(a) Exchange Act claim alleged herein is based solely on negligence.  The Section 14(a) Exchange Act claim alleged herein does not allege and does not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, knowing conduct or recklessness with regard to these non-fraud claims.

88.     The Individual Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders in the 2017 Proxy.  The 2017 Proxy contained a description of the Company's oversight of risk management, however, that description misrepresented and failed to disclose that the Company's internal controls were inadequate, and that the Board was not composed of members who could effectively perform oversight duties, and had failed to provide appropriate risk oversight of the Company's activities.  By reason of the conduct alleged herein, the Individual Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, ARA misled and/or deceived its stockholders by making misleading statements and omissions that were an essential link in its stockholders heeding ARA's recommendation to approve the election of certain individuals to the Board.

89.     The misleading information contained in the 2017 Proxy was material to ARA's stockholders in determining whether or not to elect certain individuals to the Board.  The solicitation process in connection with the Proxy was an essential link in the approval of the election of these individuals to the Board.

90.     Plaintiff, on behalf of ARA, seeks relief for damages inflicted upon the Company based upon the misleading Proxy in connection with the improper election of certain individuals to the Board.

## COUNT II

### BREACH OF FIDUCIARY DUTY

91.     Plaintiff incorporates by reference and realleges each and every above allegation as though fully set forth herein.

92.     Plaintiff fairly and adequately represents the Company, and has made a demand, which the Board wrongfully refused.

93.     By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe ARA and its stockholders fiduciary duties of care, loyalty, good faith, candor and oversight.

94.     The Individual Defendants violated and breached their statutory and common law fiduciary duties.

95.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

96.     The Individual Defendants' failures were not an exercise of reasonable business judgment.

97.     As a direct and proximate result of the Individual Defendants' failures to faithfully perform their fiduciary obligations, ARA has sustained material financial and reputational damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to ARA and its stockholders.

98.     Plaintiff, on behalf of ARA, has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff, on behalf of ARA and its stockholders, be fully protected from the immediate and irreparable injury that the Individual Defendants' actions have inflicted, and threaten to inflict.

## COUNT III

### GROSS MISMANAGEMENT

99.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

100.     Plaintiff fairly and adequately represents the Company, and has made a demand, which the Board wrongfully refused.

101.     The Individual Defendants had a fiduciary duty to ARA and its stockholders to prudently supervise, manage and control the operations and business of ARA.

102.     The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of ARA in a manner consistent with the duties imposed upon them by statutory and common law.  By committing the misconduct alleged herein, Defendants breached their fiduciary duties of care, loyalty, oversight, good faith, candor and oversight in the management and administration of ARA's affairs and in the use and preservation of ARA's assets.

103.     During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet caused ARA to engage in schemes complained of herein which they knew had an unreasonable

risk of damage to ARA, thus breaching their fiduciary duties to the Company and its stockholders.  As a result, Defendants grossly mismanaged ARA.

## COUNT IV

### UNJUST ENRICHMENT

104.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105.     Plaintiff fairly and adequately represents the Company, and has made a demand, which the Board wrongfully refused.

106.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of ARA.

107.     An inequity exists due to the Individual Defendants' unjust enrichment at ARA's expense and detriment.

108.     Plaintiff, as a stockholder and representative of ARA, seeks restitution from these Individual Defendants, and each of them, and seeks an Order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V

### INDEMNIFICATION

109.     Plaintiff incorporates by reference and realleges each and every above allegation as though fully set forth herein.

110.     The Individual Defendants violated their fiduciary duties of loyalty, good faith, and due care.  ARA has suffered significant injury as a result of the Individual Defendants' breaches of fiduciary duty as alleged herein.  Plaintiff, on behalf of the Company, seeks relief

from the Individual Defendants on the theory of indemnity for all damages that occurred as a result of the Individual Defendants' violations of their fiduciary obligations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding against all Defendants and in favor of ARA the amount of damages sustained by it as a result of the Individual Defendants' breaches of statutory and common law fiduciary duties, gross mismanagement, and unjust enrichment;

B.     Directing ARA to take all necessary action to reform and improve its compliance, internal control systems and corporate governance practices and procedures to comply with applicable laws and protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, reforming the Company's compliance, internal controls and corporate governance practices and procedures as necessary to prevent violations of federal and state healthcare laws, rules and regulations, and taking such other action as may be necessary;

C.     Awarding ARA restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by them;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 25, 2017

By his attorneys,

*/s/ Adam M. Stewart*_____
Edward F. Haber (BBO#215620)
Adam M. Stewart (BBO#661090)
SHAPIRO HABER & URMY LLP
Seaport East
Two Seaport Lane
Boston, Massachusetts 02210
Telephone: (617) 439-3939
Facsimile:  (617) 439-0134
ehaber@shulaw.com
astewart@shulaw.com


Joseph H. Weiss
David C. Katz
WEISSLAW LLP
1500 Broadway
New York, New York 10036
Telephone:  (212) 682-3025
Facsimile:  (212) 682-3010
jweiss@weisslawllp.com
dkatz@weisslawllp.com

## VERIFICATION

I, Stephen Bushansky, hereby verify that I am a shareholder of American Renal Associates Holdings, Inc. ("American Renal" or the "Company") and am ready, willing, and able to pursue this shareholder derivative action on behalf of American Renal. I first purchased American Renal shares in the Company's Initial Public Offering of shares, have held American Renal shares continuously since that time, and continue to hold American Renal shares. I have reviewed the allegations in the Shareholder Derivative Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.

Dated: October 24, 2017

_stephen bushansky_
stephen bushansky (Oct 24, 2017)

Stephen Bushansky

# EXHIBIT A



16th Floor
1500 Broadway
New York, NY 10036
TEL. (212) 682-3025
FAX (212) 682-3010
www.WeissLawLLP.com

Joseph H. Weiss, Esq.
JWeiss@weisslawllp.com

January 27, 2017

**VIA FEDERAL EXPRESS**

Mr. Joseph A. Carlucci
Chairman of the Board of Directors
American Renal Associates Holdings, Inc.
500 Cummings Center, Suite 6550
Beverly, Massachusetts 01915

Re: Shareholder Demand of Stephen Bushansky

To the Board of Directors of American Renal Associates Holdings, Inc.:

We represent Stephen Bushansky, a shareholder of American Renal Associates Holdings, Inc. ("American Renal" or the "Company") at all times relevant herein, and are writing to demand, on behalf of our client, that you and the American Renal Board of Directors (the "Board") take all necessary steps to recover the substantial damages incurred by the Company as a result of the fraudulent business practices, breaches of fiduciary duty and other illegal conduct described herein, implement effective internal control systems, compliance mechanisms, and corporate governance practices and procedures, the absence of which further damages American Renal and its shareholders, and repair the reputational harm caused to the Company.

Since at least the beginning of 2016, American Renal, in conjunction with the American Kidney Fund ("AKF"), has engaged in a fraudulent scheme to take advantage of patients who suffer from End Stage Renal Disease ("ESRD") by means of a so-called "Patient Assistance Program" ("PAP"). PAPs are programs offered by drug makers, nonprofit groups, or state governments to provide financial assistance to individuals unable to afford prescription drugs or treatments. PAPs have been the subject of regulatory scrutiny for over twenty (20) years due to the fact that they may be easily abused and lead to fraudulent billing practices. In breach of their fiduciary duties, American Renal's directors and officers have engaged in and/or overseen a scheme to reap profits through fraudulent practices in direct contravention to the substantial body of regulatory guidance regarding PAPs. This fraudulent scheme has materially damaged American Renal and its shareholders. The Company has been sued by an insurer alleging that American Renal defrauded it and ESRD patients; it has been sued by a class of investors claiming to have been misled by American Renal's false public filings and other statements describing its financial condition and business operations; and has become the subject of regulatory investigations by both the Securities and Exchange Commission (the "SEC") and the Center for Medicare and Medicaid Services (the "CMS").

Weiss[...]

Mr. Joseph A. Carlucci
Chairman of the Board of Directors
January 27, 2017
Page 2

*American Renal's Operations Are the Subject of Substantial Regulatory Guidance*

Various regulators and agencies have provided guidance for the healthcare industry relating to PAPs. As far back as 1994, the Department of Health and Human Services ("HHS") and Office of the Inspector General ("OIG") issued a "special fraud alert" directly to healthcare providers. The special fraud alert explained that healthcare providers' waiver of dialysis patients' cost-sharing obligations results in the misstatement of the actual charge for dialysis services provided and that, by engaging in such cost-sharing waivers, healthcare providers could be unlawfully inducing patients to purchase their services. In fact, some states, such as Florida, have enacted a statutory prohibition against such activity, deeming it to be insurance fraud.

In 1997, the AKF requested that the OIG provide an advisory opinion as to a program wherein dialysis providers, such as American Renal, made donations to the AKF to pay for ESRD patients' premiums. On June 11, 1997, the OIG issued Advisory Opinion 97-1, which found that, in order to avoid violating the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the AKF and similar organizations could not earmark contributions for the use of particular beneficiaries or groups of beneficiaries, or take into account the identity of the referring provider or the amount of any such donation, or assure providers that the amount of assistance patients would receive correlated in any way to the amount of the provider's donations.

In November 2005, the OIG issued a Supplemental Special Advisory Bulletin providing guidance on the application of fraud and abuse laws to PAPs, noting that some charities focus their efforts on patients with particular diseases, and that donors may choose to earmark funds for patients with those diseases. However, the OIG warned that these situations presented an "elevated risk" of fraud and abuse, and recommended that companies limit these types of donations.

In November 2013, the HHS Secretary issued a FAQ recommending that insurance issuers reject third party premium payments. The HHS Secretary cited significant concerns with the practice, due to the fact that it may skew the insurance risk pool, creating an unlevel field in the marketplace. The HHS Secretary warned that HHS would be monitoring this practice, and would take appropriate action if necessary.

In May 2014, the OIG issued a Supplemental Special Advisory Bulletin regarding donor contributions to PAPs, warning that such contributions may violate the federal Anti-Kickback Statute if they induce that PAP to recommend donor products or otherwise influence patients. The OIG also expressed similar concerns regarding a PAP's grant of financial assistance, stating that the federal Anti-Kickback Statute could also be violated if such a grant is made to influence the patient to purchase, or to influence a physician to prescribe, certain products or services. The OIG went so far as to issue a general warning about charities appearing to induce the purchase of a donor's products, admonishing that such charities "may be subject to scrutiny if the disease funds result in funding exclusively or primarily the products of donors." The OIG recommended

Weiss Law

Mr. Joseph A. Carlucci
Chairman of the Board of Directors
January 27, 2017
Page 3

that donors should not be provided with information sufficient to match their donations with the number of recipients using their products, as such efforts would violate the federal Anti-Kickback Statute.

*The Fraudulent Scheme Engaged in by American Renal's Directors And Officers*

Despite the substantial regulatory guidance, American Renal's officers and directors engaged in a fraudulent scheme to inflate reported revenues and profits by convincing patients to abandon their Medicare or Medicaid coverage, and enroll in commercial coverage plans offered by United Healthcare of Florida, Inc. ("United Healthcare") under the Patient Protection and Affordable Care Act (the "ACA"). The Company would then proceed to submit charges to United Healthcare for products and services at inflated rates more than twenty (20) times greater than it would have received pursuant to Medicare or Medicaid.

Pursuant to the fraudulent scheme, American Renal convinced its ESRD patients to forego Medicare or Medicaid's coverage plans and instead enroll in United Healthcare's commercial coverage plans. American Renal then directed its patients to the AKF, and specifically the AKF's Health Insurance Premium Payment ("HIPP") program, which provides premium assistance to those who cannot afford to pay their premiums. The AKF describes this program as a "last resort" source of assistance to dialysis patients; restricted to those patients who have no means of paying health insurance premiums, and who would otherwise be forced to forego dialysis.

American Renal controlled every step of the patient relationship with the AKF – introducing the HIPP programs to patients in their clinics, assisting patients in filling out the applications, and submitting the applications on behalf of the patients. In this process, American Renal would counsel patients, and steer them into enrollment in the United Healthcare commercial coverage plans most favorable to the Company, resulting in the highest possible reimbursement for American Renal. Additionally, the Company made earmarked donations to the AKF specifically to be used for its patients' premiums. Patients were instructed to bring their premium bills directly to American Renal's clinics, or informed that the AKF would send the premium assistance checks directly to the patients, in order to avoid detection of the scheme by those insurance providers that did not accept third-party premium payments. Once the premium payments were secured, American Renal – in direct violation of the HHS and OIG warnings and guidance, its own Code of Ethics and Conduct,[1] and in blatant disregard of the terms of United Healthcare's commercial coverage plans – waived its patients' copay, coinsurance and deductible obligations.

---

[1] The Company maintains a Code of Ethics and Conduct that contains an express "prohibition on improper inducements" forbidding employees from "routinely waiving copays and deductibles," as well as "providing or promising benefits, payments, gifts or other things of value" to patients.

Weiss...

Mr. Joseph A. Carlucci
Chairman of the Board of Directors
January 27, 2017
Page 4

As a direct result of this fraudulent scheme, patients who already had access to Medicare and Medicaid coverage were enrolled in United Healthcare commercial coverage plans they did not need and could not afford. American Renal substantially benefitted by increasing its per-dialysis-session reimbursement rate to more than twenty (20) times the sub-$200 payments it would have received had it billed Medicare or Medicaid as otherwise would have been required. In response to discovering American Renal's fraudulent scheme, United Healthcare has stopped all payments to the Company under these plans. Even with the discovery of this scheme, American Renal has caused unwarranted clinical "gap exception" requests to be submitted to United Healthcare in order to continue to obtain these fraudulently inflated rates.

The AKF and its operations have also recently come under increased scrutiny. Indeed, Blue Cross of Idaho recently began to refuse to accept premium payments from third parties such as the AKF. In March 2016, Dean L. Cameron, the Director of Idaho's Department of Insurance, publicly supported Blue Cross of Idaho's decision, noting that, as admitted in the AKF's own annual report, the AKF's HIPP program is funded by contributions from dialysis providers with a direct financial interest in their patients' care, and concluded that such providers were indirectly paying these patients' premiums.

*American Renal Falsely Represents In Its Prospectus That It Has "Robust Compliance"*

On April 22, 2016, American Renal filed with the SEC a Prospectus in connection with its initial public offering of stock (the "IPO"). American Renal emphasized in the Prospectus that its performance is driven by "robust compliance" with stringent billing, reimbursement, and compliance procedures. Indeed, the Company noted its success, as compared to other dialysis centers, in avoiding penalties from regulators such as CMS.

American Renal further emphasized in its Prospectus and other SEC filings the dire repercussions of failing to maintain compliance with the laws, rules, and regulations within which the Company operates. The Prospectus expressly cautions that a failure to adhere with those various laws, rules, and regulations, including, but not limited to, Medicare and Medicaid reimbursement requirements and state False Claims laws, could cause significant damage to the Company, and have other "severe consequences."

*United Healthcare Files Suit against American Renal*

On July 1, 2016, a lawsuit was filed in the United States District Court for the Southern District of Florida by United Healthcare and certain of its affiliates against the Company alleging fraud, misrepresentation, tortious interference, unjust enrichment, and civil conspiracy, in addition to insurance fraud. *United Healthcare of Florida, Inc., et. al. v. American Renal Associates Holdings, Inc., et. al.,* Case No. 9:16-cv-81180-KAM (the "United Healthcare Lawsuit"). The complaint alleges that American Renal preyed upon vulnerable patients suffering from ESRD, "converting them from patients to pawns in a scheme to maximize [American Renal]'s profits." The revelations in the United Healthcare Lawsuit have had a far

Weiss

Mr. Joseph A. Carlucci
Chairman of the Board of Directors
January 27, 2017
Page 5

reaching and potentially devastating impact on the Company, precipitating, among other things, regulatory investigations by the SEC and CMS, and a class action lawsuit for violation of the federal securities laws.

*The SEC And CMS Commence Investigations Of American Renal*

On July 26, 2016, the SEC informed American Renal that it had initiated an inquiry into the Company's conduct relating to the subject matter covered by the United Healthcare Lawsuit, requesting documents and information from the Company.

Additionally, on August 18, 2016, CMS announced that it had launched its own investigation into dialysis centers, such as those operated by American Renal, engaging in the inappropriate steering of patients eligible for Medicare or Medicaid into commercial coverage plans and third party premium payment providers and affiliated organization payments. The CMS indicated that it was weighing financial penalties on those providers.

*American Renal And Certain Of Its Officers And Directors Have*
*Been Sued For Violation Of The Federal Securities Laws*

On September 2, 2016, a class action complaint was filed in the United States District Court for the District of Massachusetts, styled *Esposito v. American Renal Associates Holdings, Inc.*, Case No. 16-cv-11797, alleging that the Company, its Chairman and CEO Joseph A. Carlucci, its President Syed T. Kamal, and its Vice President and CFO Jonathan L. Wilcox violated the Securities Act of 1933 and Securities Exchange Act of 1934 in connection with the fraudulent scheme described herein.

*American Renal Has Been Materially Damaged*
*By The Conduct Of Its Directors And Officers*

Needless to say, the Company has been irreparably damaged by the misconduct described herein. Not only does American Renal face substantial liability in the United Healthcare Lawsuit, and the potential of substantial fines levied by the SEC and CMS in the wake of their investigations, but a class of American Renal shareholders has filed a class action lawsuit against the Company. The Company has incurred, and will continue to incur, substantial costs defending itself in those lawsuits and investigations. Moreover, the Company faces even further material damage in resolving those lawsuits and investigations.

By this letter, we demand, on behalf of our client, that a thorough and far-reaching investigation of the Company's internal controls, corporate governance practices and procedures, and compliance mechanisms be performed by a strictly independent party. The independence, oversight, and fiduciary standards employed by the Board of Directors must also be thoroughly investigated. Action must also be taken to repair the financial harm caused to American Renal.

WeissLaw

Mr. Joseph A. Carlucci
Chairman of the Board of Directors
January 27, 2017
Page 6

All those responsible for the misconduct described herein must be terminated and action must be taken to recover the Company's financial losses from such persons.

The intention of this demand letter is to give the Board the opportunity to arrange for an independent investigation, to institute claims on behalf of the Company against the persons responsible for causing the damages specified herein, and to institute appropriate internal controls, compliance mechanisms, and corporate governance procedures. We would be pleased to meet with the Board or its representatives to discuss this demand and to assist in the conduct of any investigation and consideration of initiatives, programs, and policies to be adopted. If you fail to take the requested actions within ninety (90) days of the date of this letter, we will assume that you have decided not to pursue them and we will institute an action to obtain the remedies we are asking you to obtain.

By making this demand, we in no way concede the independence or disinterestedness of American Renal's Board and entirely reserve our client's rights to challenge the American Renal's Board's independence and disinterestedness. In fact, we submit that, based on their corporate governance failings, the Board must allow these claims to be pursued on behalf of the Company by our client.

Very truly yours,

Joseph H. Weiss

JHW/pjm

# EXHIBIT B

# MILBANK, TWEED, HADLEY & MCCLOY LLP

28 LIBERTY STREET

NEW YORK, NY 10005

———————

212-530-5000

FAX: 212-530-5219

Antonia M. Apps
Partner
DIRECT DIAL NUMBER
+1 (212) 530-5357
E-MAIL: aapps@milbank.com

LOS ANGELES
424-386-4000
FAX: 213-629-5063

WASHINGTON, D.C.
202-835-7500
FAX: 202-835-7586

LONDON
44-20-7615-3000
FAX: 44-20-7615-3100

FRANKFURT
49-69-71914-3400
FAX: 49-69-71914-3500

MUNICH
49-89-25559-3600
FAX: 49-89-25559-3700

BEIJING
8610-5969-2700
FAX: 8610-5969-2707

HONG KONG
852-2971-4888
FAX: 852-2840-0792

SEOUL
822-6137-2600
FAX: 822-6137-2626

SINGAPORE
65-6428-2400
FAX: 65-6428-2500

TOKYO
813-5410-2801
FAX: 813-5410-2891

SÃO PAULO
55-11-3927-7700
FAX: 55-11-3927-7777

May 8, 2017

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Joseph H. Weiss, Esq.
WeissLaw LLP
1500 Broadway, 16th Floor
New York, NY 10036

    Re:   Shareholder Demand of Stephen Bushansky

Dear Mr. Weiss:

    This letter responds to your letter dated January 27, 2017, on behalf of Stephen Bushansky (the "Demand"), in which you, on behalf of Mr. Bushansky, demand that the Board of Directors ("Board") of American Renal Associates Holdings, Inc. ("ARAH" or the "Company") (1) investigate the allegations of wrongdoing set forth in the Demand; (2) institute claims on behalf of the Company (the "Claims") against unspecified persons; and (3) implement unspecified internal controls, compliance mechanisms and corporate government measures.

    In response to the Demand, the Board of Directors of ARAH (the "Board") formed a committee (the "Demand Committee"), among other things, to assist the Board in connection with responding to the Demand or any related proceedings, and to review the facts and circumstances relating to the allegations contained in the Demand. The Demand Committee is comprised of three of the six outside, non-management directors currently serving on the Board. The Demand Committee engaged Milbank, Tweed, Hadley & McCloy LLP ("Milbank") to assist the Demand Committee in connection with fulfilling its duties.

Joseph H. Weiss, Esq.
May 8, 2017
Page 2

The Demand Committee conducted a good faith investigation. The Demand Committee received a report from Milbank on an internal review already conducted by Milbank, the civil litigation and government inquiries facing the Company, and the applicable legal principles. The Demand Committee also considered the information its members had learned in prior meetings in connection with the internal review previously conducted by Milbank. During the course of the investigation, Milbank answered questions from members of the Committee, and thoroughly discussed the issues relevant to the Demand.

After a thorough consideration of the Demand, the Demand Committee made a recommendation to the Board that the Demand be refused. The Board, after being fully informed as to all relevant facts and legal principles, and considering the recommendation of the Demand Committee, determined, in the exercise of its business judgment, that it is not in the best interests of ARAH to pursue any of the actions set forth in the Demand at this time. This determination was reached after a thorough, careful, and deliberative analysis of the relevant considerations.

*Conclusion*

Exercising its independent business judgment, the Board has unanimously voted that the Demand be refused. The Board directed that Milbank send this response to you.

Very truly yours,

Antonia M. Apps

# EXHIBIT C

**WL**
**WeissLaw** LLP
New York | Los Angeles

16th Floor
1500 Broadway
New York, NY 10036
TEL (212) 682-3025
FAX (212) 682-3010
www.WeissLawLLP.com

Joseph H. Weiss
JWeiss@WeissLawLLP.com

May 23, 2017

**VIA EMAIL AND FIRST CLASS MAIL**

Antonia M. Apps, Esq.
Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, NY 10005

          Re:   American Renal Associates Holdings, Inc.
                  Shareholder Demand of Stephen Bushansky

Dear Ms. Apps:

       Your May 8, 2017 correspondence (the "Demand Refusal Letter") conveys the refusal of the shareholder Demand made by our client, Stephen Bushansky, upon the Board of Directors (the "Board") of American Renal Associates Holdings, Inc. ("ARAH" or the "Company"). The Demand Refusal Letter states that the Demand Committee "conducted a good faith investigation," made a "thorough consideration of the Demand," and that the determination to recommend that the Board refuse the Demand was made "after a thorough, careful, and deliberative analysis of the relevant considerations." However, your correspondence does not indicate whether the Demand Committee prepared a written report regarding its purported investigation, analysis and determination. We request that you inform us whether such a written report was prepared by the Demand Committee, and, in the event that the Demand Committee did prepare such a report, that it be provided to us forthwith.

       The Demand Refusal Letter references a "report from Milbank on an internal review already conducted by Milbank, the civil litigation and government inquiries facing the Company, and the applicable legal principles." We further request that this report be provided to us forthwith for review, in addition to any materials considered by Milbank, the Demand Committee and/or the Board in its investigations of ARAH with regard to the Demand or any related proceedings.

       We also request that we be provided with all documents considered by, as well as all additional documents prepared by, the Demand Committee in its evaluation of, and recommendation to reject, the Demand, including, but not limited to, the following:

1.   Documents relating to the creation and function of the Demand Committee, including all documents relating to the Board's decision-making process regarding the selection of the members of the Demand Committee, and any resolution establishing the Demand Committee (and amendments thereto) or appointing its members;



Ms. Antonia M. Apps, Esq

2.  Documents relating to the Demand Committee's retention of Milbank, Tweed, Hadley & McCloy LLP ("Milbank");

3.  Documents concerning the compensation paid to Milbank in the past five (5) years in connection with any services provided to the Company and/or the Board (and any subcommittee thereof) and/or any other company in which a senior member of the Company's management or a Company director has served as an officer or director in the past five (5) years;

4.  Documents furnished to and/or considered by the Demand Committee, Milbank and/or the Board, in connection with the investigation of the Demand, as well as the decision to reject the Demand;

5.  Communications between the Demand Committee, Milbank and/or the Board concerning the referenced investigation or the Demand;

6.  Documents relating to any interviews of current or former ARAH officers and directors, including all interview notes, tapes and transcripts;

7.  Documents related to any presentations made by the Demand Committee and/or Milbank to the Board regarding the referenced investigation or the Demand;

8.  Records reflecting documents that the Company or any individual would not produce to, or would not allow review by, the Demand Committee, Milbank or the Board, as well as documents reflecting the identity of any witness who would not agree to be interviewed by the Demand Committee, Milbank or the Board;

9.  Documents provided to and/or considered by the Board related to the Board's evaluation and adoption of the Demand Committee's recommendation to refuse the Demand; and

10. Documents reflecting the independence and disinterest, or lack thereof, of the Demand Committee and the Board members.

We are available at any mutually convenient time to discuss the Demand, its refusal, or the requests made herein.

Very truly yours,

Joseph H. Weiss

# EXHIBIT D

*American Renal*

# MILBANK, TWEED, HADLEY & McCLOY LLP

**28 LIBERTY STREET**

**NEW YORK, NY 10005**

——————

212-530-5000

FAX: 212-530-5219

Antonia M. Apps
Partner
DIRECT DIAL NUMBER
+1 (212) 530-5357
E-MAIL: aapps@milbank.com

June 6, 2017

**LOS ANGELES**
424-386-4000
FAX: 213-629-5063

**WASHINGTON, D.C.**
202-835-7500
FAX: 202-835-7586

**LONDON**
44-20-7615-3000
FAX: 44-20-7615-3100

**FRANKFURT**
49-69-71914-3400
FAX: 49-69-71914-3500

**MUNICH**
49-89-25559-3600
FAX: 49-89-25559-3700

**BEIJING**
8610-5969-2700
FAX: 8610-5969-2707

**HONG KONG**
852-2971-4888
FAX: 852-2840-0792

**SEOUL**
822-6137-2600
FAX: 822-6137-2626

**SINGAPORE**
65-6428-2400
FAX: 65-6428-2500

**TOKYO**
813-5410-2801
FAX: 813-5410-2891

**SÃO PAULO**
55-11-3927-7700
FAX: 55-11-3927-7777

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Joseph H. Weiss, Esq.
WeissLaw LLP
1500 Broadway, 16th Floor
New York, NY 10036

Re:   Further Request by Shareholder Stephen Bushansky

Dear Mr. Weiss:

This letter responds to your letter dated May 23, 2017, in which you request additional documents related to the determination by the Board of Directors ("Board") of American Renal Associates Holdings, Inc. ("ARAH" or the "Company") to refuse the demands made in your January 27, 2017 letter on behalf of Stephen Bushansky (the "Demand"). In response to your inquiry, the committee formed to assist the Board in connection with responding to the Demand (the "Demand Committee") retained Milbank to assist in connection with fulfilling the Demand Committee's duties. Milbank conducted a thorough and extensive investigation, reviewing over 100,000 documents and interviewing dozens of witnesses, and informed the Demand Committee with respect to its findings. The Demand Committee and the Board determined that it would be

Joseph H. Weiss, Esq.
Page 2

in the best interests of ARAH and its stockholders to refuse the Demand.  The Company declines
to provide you the documents requested in your letter.

Very truly yours,

Antonia M. Apps